*Formatted for Electronic Distribution*                                                              *For Publication*

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF VERMONT

In re:

    Cory S. Austin and  
    Lucinda Hill Austin,  
         Debtors.

Chapter 13 Case  
# 07-10031

Filed & Entered  
On Docket  
August 7, 2007

*Appearances:*     Michelle Kainen, Esq.                  Jan Sensenich, Esq.  
                       White River Junction, Vt.            White River Junction, Vt.  
                       For the Debtors                              For the Trustee - Movant

## <u>MEMORANDUM OF DECISION</u>
### <u>OVERRULING THE TRUSTEE'S OBJECTION TO THE DEBTORS' CHAPTER 13 PLAN<br>AND GRANTING CONFIRMATION OF THE PLAN</u>

       This case presents questions of first impression in this District concerning Chapter 13 plan confirmation requirements for above-median debtors under section 1325(b), as amended by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"). The Trustee in this case has objected to confirmation of the Debtors' plan, asserting that: (1) the Debtors are not devoting all of their projected disposable income to the plan; (2) the Debtors' payments on a backhoe lease – a payment in excess of their proposed plan payment – constitutes an unreasonable and unnecessary expense; and (3) the Debtors' plan is not proposed in good faith. To adjudicate the objection raised, the Court must decide if amended § 1325(b) requires courts to use the figures from the means test, or Schedules I and J, when determining the projected disposable income an above-median debtor must devote to a Chapter 13 plan.

       For the reasons set forth below, the Court overrules the Trustee's objection. The Court holds that the plain language of § 1325(b), as amended by BAPCPA, requires courts to rely exclusively on the means test when computing the minimum Chapter 13 plan payment for above-median debtors and, according to the means test, the Debtors are devoting all of their disposable income to the Plan. As to the second ground for the objection, the Court holds that it does not have the discretion to determine the reasonableness of payments that these above-median Debtors propose to make on the backhoe, since that debt was current on the bankruptcy filing date. Third, the Court holds that the amount of the Debtors' plan payment does not determine whether the Plan was proposed in good faith and there is no other allegation before the Court to warrant a determination that the Debtors' Plan was not filed in good faith. Accordingly, the Court confirms the Debtors' Plan.

### JURISDICTION

       The Court has jurisdiction over this contested matter pursuant to 28 U.S.C. § 157(b)(2)(A) & (L).

## THE FACTS

Cory S. Austin and Lucinda Hill Austin ("the Debtors") commenced this case by filing a petition and schedules under Chapter 13 on January 24, 2007 (doc. # 1). The Debtors scheduled $55,025 in secured debt plus $175,410 in unsecured business and personal debt. On their Schedule G, Executory Contracts and Unexpired Leases, they included a "48-month lease on backhoe. Payment shared with Debtor's father." Schedule I of their petition listed the Debtors' combined average monthly income, as of the filing date, at $4,814. Schedule J indicated that the Debtors' monthly expenses were $4,534, leaving a monthly net income of $280. In the "Installment payments" section of Schedule J, the Debtors allocated $325 per month for "1/2 Backhoe Payment."

The Debtors filed an Official Form B22C, the "Chapter 13 Statement of Current Monthly Income and Calculation of Commitment Period and Disposable Income," known as the "means test," with their petition. The means test form, promulgated by the Judicial Conference, tracks the text of the amended §1325(b).[1] By itemizing their income and allowable deductions according to the directions on the form, debtors determine if they are above- or below-median, what their applicable commitment period is and, if above-median, what their monthly disposable income is for purposes of § 1325(b)(2). Part I of the means test form requires debtors to calculate their income in a way that "must reflect average monthly income received from all sources, derived during the six calendar months prior to filing the bankruptcy case" (means test, line 1). The Debtors calculated their monthly income to be $5,974 (means test, line 11). Their annualized income (multiplying the monthly figure by 12) came to $71,688 (means test, line 21), which put them above the $63,753 median family income for a three-member household in Vermont. As "above-median debtors," the means test requires the Debtors to determine their disposable income as specified in § 1325(b)(3) (see Part III of the means test form). Also, as above-median debtors, the Debtors' applicable commitment period is five years (means test, line 17).

Part IV of the means test form is entitled "Calculation of Deductions Allowed under § 707(b)(2)." In this part of the form, above-median debtors calculate their expenses as deductions from income. The deductions on the form are divided into four Subparts: Subpart A contains deductions under national Internal Revenue Service ("IRS") standards for items such as food, clothing, household supplies, and personal care; deductions under local IRS standards for housing and utilities, and transportation[2]; and "Other Necessary Expenses" such as taxes, life insurance, and child care (means test, lines 24-38). Subpart B, "Additional

---

[1] All statutory citations herein refer to Title 11, United States Code (the "Bankruptcy Code"), unless otherwise indicated. In addition, all references to § 1325(b) refer to the statute as amended by BAPCPA, unless otherwise noted.

[2] Here, the Debtors included a $1,368 deduction for food, clothing, household supplies, personal care, and miscellaneous. The $1,368 figure was taken from the IRS National Standards for Allowable Living Expenses for the applicable family size and income level (available at www.usdoj.gov/ust/meanstesting). They also listed $530 in housing, utilities, and non-mortgage expenses, based on the IRS Local Housing and Utilities Standards.

2

Expense Deductions under § 707(b)," contains deductions for items such as health insurance, home energy costs, and charitable contributions (means test, lines 39-46). Subpart C, "Deductions for Debt Payment," contains deductions for secured claims, priority claims, and Chapter 13 administrative expenses (means test, lines 47-51). The Debtors listed the backhoe lease in Subpart C as a $195 monthly payment[3] which represented, in compliance with the instructions on the form, the balance due amortized over sixty months (means test, line 47). The Debtors' calculated their "Total Deductions Allowed under § 707(b)(2)" in Subpart D as $6,084.15 (means test, line 52). Subtracting their total deductions from their total current monthly income, their bottom-line "Monthly Disposable Income Under § 1325(b)(2)" amounted to negative $110.15 (means test form, line 58).

The Debtors' Chapter 13 Plan (doc. # 2) proposes a payment of $280 per month for 60 months and specifies that this amount will be distributed as follows: (1) payment in full of Debtors' counsel fees; (2) a 10% commission to the Chapter 13 Trustee; (3) payment in full of past-due town property taxes; (4) payment of the arrears on the first mortgage against their residence; and (5) a dividend of 4% to the creditors holding allowed unsecured claims. The plan payment corresponds to the difference between income and expenses on Schedules I and J, rather than to the disposable income on the means test (effectively, zero).

### THE PARTIES' ARGUMENTS

The Trustee argues that since the Debtors propose to retain their backhoe and to pay $325 per month on the lease for that equipment, the Court must deny confirmation of the Plan. Specifically, he asserts that this expense permits the Debtors to commit less than all of their "projected disposable income" to the Plan and to pay ongoing expenses that are not reasonable and necessary. As a result, he contends that the Plan was not proposed in good faith (doc. # 22). The Trustee acknowledges the post-BAPCPA split of authority on the issue of what test should be applied to determine the amount an above-median debtor must commit to his or her plan. He zealously endorses the holdings of those courts that have relied upon debtors' actual income and expenses on Schedules I and J – rather than the means test – to determine the sufficiency of a proposed plan payment, and that have required the monthly expenses paid during the term of the Plan to be reasonable as a condition of confirmation. He insists that unless the Debtors redirect the monies they propose to pay for the backhoe to their plan payment, the Plan fails to meet the confirmation requirements.

The Debtors respond that: (1) they have properly calculated their "projected disposable income" by projecting the "disposable income" figure derived from their means test, zero, forward through the sixty months of the Plan and have proposed a plan payment that is in excess of this amount; (2) the reasonableness of their ongoing backhoe payment has no place in the computation of their disposable income or whether the

---

[3] In the absence of instructions on the means test form to the contrary, and in the absence of an objection by the Trustee, the Court considers the Debtors' inclusion of the backhoe lease payment under deductions for secured debt on the means test form to be proper.

3

Plan is eligible for confirmation; and (3) it is improper to rely on the amount of their plan payment in assessing whether their Plan was proposed in good faith (doc. # 23). The Debtors, too, acknowledge the split of authority concerning the proper method for calculating "projected disposable income" for above-median debtors. However, they argue that axioms of statutory construction require the Court to overrule the Trustee's objection, based upon the plain language of § 1325(b), and the fact that they do not use the backhoe for any business or income-generating purpose is irrelevant. At oral argument, the Debtors asserted that their voluntary reduction in spending on other allowed expenses, and their voluntary increase in the plan payment above the amount required by the means test, justify their retention of the backhoe during the term of the Chapter 13 plan and further support confirmation of their Plan.

## THE PERTINENT STATUTES

BAPCPA significantly amended the section of the Bankruptcy Code which sets forth the requirements for confirmation of a Chapter 13 plan. See § 1325. In particular, BAPCPA revolutionized the procedure by which debtors determine the required plan payment. The crux of the issue presented is a dispute over how to interpret the text of the amended statute. The statutory interpretation issue focuses on the meaning of "projected disposable income" in § 1325(b)(1)(B). That statute provides:

> (b)(1) If the trustee or the holder of an allowed unsecured claim objects to the confirmation of the plan, then the court may not approve the plan unless, as of the effective date of the plan –
> (A) the value of the property to be distributed under the plan on account of such claim is not less than the amount of such claim; or
> (B) the plan provides that all of the debtor's projected disposable income to be received in the applicable commitment period beginning on the date that the first payment is due under the plan will be applied to make payments to unsecured creditors under the plan.
> (2) For purposes of this subsection, "disposable income" means current monthly income received by the debtor (other than child support payments, foster care payments, or disability payments for a dependent child made in accordance with applicable nonbankruptcy law to the extent reasonably necessary to be expended for such child) less amounts reasonably necessary to be expended –
> (A) (i) for the maintenance or support of the debtor or a dependent of the debtor, or for a domestic support obligation, that first becomes payable after the date the petition is filed; and
> (ii) for charitable contributions (that meet the definition of 'charitable contributions' under §548(d)(3) to a qualified religious or charitable entity or organization (as defined in §548(d)(4)) in an amount not to exceed 15% of gross income of the debtor for the year in which the contributions are made; and

4

  (B) if the debtor is engaged in business, for the payment of expenditures necessary for the continuation, preservation, and operation of such business.

 (3) <u>Amounts reasonably necessary to be expended under paragraph (2) shall be determined in accordance with subparagraphs (A) and (B) of §707(b)(2)</u>, if the debtor has current monthly income, when multiplied by 12, greater than – [the median income of a similarly sized family in the applicable State]

§ 1325(b)(1)-(3) (emphasis added).

The other post-BAPCPA provision at issue in this case relates to the requirement that a Chapter 13 plan must be proposed in good faith in order to be confirmed:

 (a) Except as provided in subsection (b), the court shall confirm a plan if –
  * * *
 (3) the plan has been proposed in good faith and not by any means forbidden by law;

§ 1325(a)(3).

## DISCUSSION

**I. Are the Debtors Applying All of Their Projected Disposable Income to the Plan?**

 *A. The Conundrum of "Projected Disposable Income" Post-BAPCPA*

Amended § 1325 and its accompanying means test form introduced new concepts and definitions into the Bankruptcy Code. As a result, debtors, creditors, trustees, and the courts are still sorting out their meaning and interplay. Before BAPCPA, § 1325(b)(1)(B) provided that if the trustee or an unsecured creditor objected to a plan, the court could not confirm the plan unless the creditor received full value for its claim or the plan provided that "all of the debtor's <u>projected disposable income</u> to be received in the three year period beginning on the date that the first payment is due under the plan will be applied to make payments under the plan." § 1325(b)(1) (2004) (emphasis added). BAPCPA did not change this section of the statute, except to insert "applicable commitment period" in lieu of "three year period."

The drastic change wrought by BAPCPA concerned the definition of "disposable income" and the source of the figures used to calculate "projected disposable income." Pre-BAPCPA, § 1325(b)(2) defined disposable income as that "income which is received by the debtor and which is not reasonably necessary to be expended for the maintenance or support of the debtor or a dependent of the debtor." 11 U.S.C. § 1325(b)(2)(2004). In practice, debtors would subtract the sum of the monthly expenses reflected on Schedule J from the sum of the monthly income shown on Schedule I to determine their disposable income. They would then "project" that amount forward by multiplying it by the number of months of the plan. That total amount would be distributed to administrative claimants and to secured and unsecured creditors. Pre-BAPCPA, the courts determined "whether the listed expenses were reasonably necessary for the support of the debtor and any dependents." <u>In re Alexander</u>, 344 B.R. 742, 746 (Bankr. E.D.N.C. 2006). <u>See also</u> <u>In re Brady</u>, 361 B.R.

5

765, 768-69 (Bankr. D.N.J. 2007) (reprising pre-BAPCPA practice of calculating projected disposable income). The computation was straightforward, and except for disputes about the reasonableness of certain expenses, projected disposable income was not generally the basis for objections to Chapter 13 plans.

The post-BAPCPA definition of "disposable income" is "current monthly income . . . less amounts reasonably necessary to be expended for maintenance or support of the debtor" and dependents. § 1325(b)(2). The term "current monthly income" ("CMI") however, is defined as "the average monthly income from all sources" – other than Social Security and certain other income – that a debtor earned during the six months prior to filing a bankruptcy petition. § 101(10A). The change in the definition of CMI is very significant. Rather than being defined as the monthly income a debtor earns as of the filing date, CMI takes a historical view of a debtor's income. Additionally, the amended statute creates two distinct equations for computing "projected disposable income": one for debtors with income above the state median income and one for debtors with income below the state median income. It also replaces the concept that projected disposable income must be used to fund all payments under the plan with a mandate that debtors must devote all of their projected disposable income to payments for unsecured creditors.

The post-BAPCPA definition of "projected disposable income" in § 1325(b)(1)(B) has been hotly debated, and published judicial opinions reflect a broad spectrum of perspectives. Since there is such a significant split in the statutory construction of this key term, the Court will articulate the rationale for its interpretation of § 1325(b)(1)(B) and its conclusion as to how above-median debtors must compute "projected disposable income" to overcome an objection to confirmation by a trustee or unsecured creditor.

### B. *Applying the Rules of Statutory Construction to the Relevant Provisions of the Code*

1. THE INTERPRETIVE DIVIDE

In Lamie v. U.S. Trustee, 540 U.S. 526 (2004), a bankruptcy case, the Supreme Court reiterated the rule that

> [t]he starting point in discerning congressional intent is the existing statutory text . . . and not the predecessor statutes. It is well established that when the statute's language is plain, the sole function of the courts – at least where the disposition required by the text is not absurd – is to enforce it according to its terms.

Id. at 534 (quotations and citations omitted). The struggle of the courts to interpret §1325(b)(1)(B) has created an "interpretive divide" similar to that identified in Lamie. Id. at 531. On one side of the divide are the courts that interpret the word "projected" simply as an adjective modifying the defined term "disposable income." These courts calculate "disposable income" by following the steps set forth in the means test, and then project that "disposable income" figure over the five year commitment period for above-median debtors. See, e.g., In re Kolb, __ B.R. __, 2007 WL 960135 at *5-*11 (Bankr. S.D.Ohio Mar. 30, 2007); In Re Hanks, 362 B.R. 494, 498-500 (Bankr. D. Utah 2007); In re Brady, 361 B.R. 765, 771-72 (Bankr. D.N.J. 2007); In re Miller, 361 B.R. 224, 234-35 (Bankr. N.D.Ala. 2007); In re Rotunda, 349 B.R. 324, 330-31 (Bankr. N.D.N.Y.

6

2006); In re Alexander, 344 B.R. 742, 748-49 (Bankr. E.D.N.C. 2006).

Courts on the other side of the divide view the phrase "projected disposable income" as a discrete term of art that has a meaning distinct from the new statutory definition of "disposable income." These courts reason that CMI is "backward looking," reflecting the debtor's income over the six months prior to the date the plan was filed, but "projected disposable income" is forward-looking, and thus Congress must have intended "projected disposable income" to mean something different from "disposable income" – such as, anticipated income – otherwise, the word "projected" is superfluous. See, e.g., In re Casey, 356 B.R. 519, 522-23 (Bankr. E.D.Wash. 2006); In re Edmunds, 350 B.R. 636, 643-44 (Bankr. D.S.C. 2006); In re Fuller, 346 B.R. 472, 482-85 (Bankr. S.D.Ill. 2006); In re Grady, 343 B.R. 747, 750-51 (Bankr. N.D.Ga. 2006); In re Kibbe, 342 B.R. 411, 414-15 (D.N.H. 2006); In re Jass, 340 B.R. 411, 415-16 (Bankr. D.Utah 2006); In re Hardacre, 338 B.R. 718, 722-23 (Bankr.N.D.Tex. 2006). Having arrived at this reading of the statute, these courts have created divergent formulas for calculating "projected disposable income." For example, the Jass court concluded that "the number resulting from Form B22C is a starting point for the Court's inquiry only," which could be supplemented or modified depending on actual, current circumstances. Jass, 340 B.R. at 415. In contrast, the Hardacre court required the debtor to factor in her actual expenses and use her actual disposable income, as reflected in Schedules I and J, to compute her payment. Hardacre, 338 B.R. at 722.

The issue raised by the Trustee's objection is whether the Debtors can fulfill their obligation to devote all of their projected disposable income to the Plan if they do not relinquish their backhoe and add that amount to their plan payment. To adjudicate that "projected disposable income" based objection, the Court addresses first the proper method for computing the Debtors' disposable income.

2. CALCULATING THE INCOME SIDE OF "DISPOSABLE INCOME" FOR ABOVE-MEDIAN DEBTORS

Section 1325(b)(2) states that the income component of disposable income is "current monthly income," a defined term (see § 101(10A)), minus amounts in specific categories not relevant here. CMI is defined as "the average monthly income from all sources" – other than Social Security and certain other income – that a debtor receives during the six months prior to filing a bankruptcy petition. It is the income figure reported on line 11 of the means test. There can be little doubt that § 1325(b)(2), by incorporating CMI as the basis for a debtor's income, relies upon income data from the pre-petition period. The statute makes no reference to any other income and since "current monthly income" is a defined term, the Court finds no support for using income from the date of filing or any other time period to compute "disposable income." See, e.g., In re Nance, 2007 WL 2028579 at * 2 (Bankr. S.D.Ill. July 10, 2007) (applying § 1325(b)(2)'s provisions to arrive at the income side of the disposable income equation); Eugene Wedoff, Means Testing in the New § 707(b), 79 Am. Bankr. L.J. 231, 244-45 (Spring 2005).

3.   CALCULATING THE EXPENSE SIDE OF "DISPOSABLE INCOME" FOR ABOVE-MEDIAN DEBTORS

Having found that the means test is the sole vehicle for calculating the income element of above-median debtors, the Court now turns to the question of how the expense element of disposable income is calculated.

Section 1325(b)(2) defines "disposable income" and directs the debtor to subtract "amounts reasonably necessary to be expended for the maintenance or support of the debtor or a dependent of the debtor" from the debtor's current monthly income. § 1325(b)(2)(A)(i). To ascertain the "amounts reasonably necessary to be expended" in this case – i.e., the expenses or "deductions" that may be taken by the Debtors in the process of calculating their disposable income – the Debtors are bound to follow the directives of § 1325(b)(3). That subsection is unambiguous. It specifies that the expenses of above-median debtors "shall" be determined according to § 707(b)(2)(A) and (B),[4] the terms of which are incorporated in the means test form Part IV as "Calculation of Deductions Allowed Under § 707(b)(2)."

For above-median debtors, their expenses "are drawn, not from the debtor's Schedule J, but from certain Internal Revenue Service standards" found in § 707(b)(2)(A)(ii)(I). In re Farrar-Johnson, 353 B.R. 224, 228 (Bankr. N.D.Ill. 2006). Schedule J has no place in the post-BAPCPA expense calculus. The plain language of the statute permits no contrary reading:

> [§ 1325(b)(3)]makes clear that Schedule J has no role in calculating disposable income. That section states plainly that disposable income 'shall' be determined under section 707(b)(2) using IRS standards. 11 U.S.C. § 707(b)(2). Although context may sometimes suggest otherwise, 'shall' typically means 'must.' . . . For an above-median debtor, then, expenses must be calculated under section 707(b)(2); what the debtor lists as expenses on his Schedule J, outrageous or not, is beside the point.

Id. at 228-29 (citations omitted). Accord Alexander, 344 B.R. at 746; In re Barr, 341 B.R. 181, 185 (Bankr. M.D.N.C. 2006). As the Debtors correctly point out, "Under the revised disposable income text, Congress has determined what expenses are reasonably necessary, thereby relieving courts from the duty to [do so]" (doc. # 23 at 12).  The Farrar-Johnson court provides some valuable insight into the legislative process that created an inflexible system for computing the expenses of above-median debtors:

> Allowing Schedule J back into the disposable income equation, as the trustee urges, would undo what Congress sought to accomplish in section 1325(b)(3). One of the aims of the means test was to limit judicial involvement – and so judicial discretion – by making mechanical the determination of abuse under section 707(b). . . . The means test in section 1325(b)(3) is meant to have the same mechanical effect. . . . Although the trustee finds this new regime distasteful, Congress evidently knew what it was doing.

---

[4]  Before BAPCPA, the test set out in § 707(b)(2) had been the basis for bankruptcy courts to determine whether granting relief to a Chapter 7 debtor would be a substantial abuse of the bankruptcy system; it is not a new provision.

353 B.R. at 229 (citations omitted). <u>Accord</u> <u>In re Guzman</u>, 345 B.R. 640, 642 (Bankr. E.D.Wisc. 2006) ("Although contrary to the stated purpose of BAPCPA and seemingly discriminatory against chapter 13 debtors with incomes below the median, the unambiguous language of the new statute compels but one answer: the above-median debtor's expense deductions are governed by Form B22C, not by Schedule J."); <u>Brady</u>, 361 B.R. at 772.

The Court therefore concludes that § 1325(b)(3) requires above-median debtors like the Austins to use the deductions set out in § 707(b)(2) to compute the expense element of the "disposable income" equation, without regard to their actual expenses on the date of the bankruptcy filing.

4. EXTRAPOLATING "DISPOSABLE INCOME" TO "PROJECTED DISPOSABLE INCOME"

Having found that the means test alone supplies the figures used to compute the disposable income of above-median debtors, this Court joins the numerous bankruptcy courts that have held that the plain language of the statute compels the conclusion that "projected disposable income" means "disposable income" – calculated using the formula set forth in § 1325(b)(2) and (3) – "projected" over the debtor's applicable commitment period, without exceptions, presumptions, or caveats of any kind:

> Both 'projected disposable income' and 'disposable income' fall under subsection (b) of § 1325. First, (b)(1) states that projected disposable income is to be applied toward unsecured creditors under the plan. Then, (b)(2) states "For purposes of this subsection, the term 'disposable income' means . . ." 11 U.S.C. § 1325(b)(2). If 'disposable income' is not linked to 'projected disposable income' then it is just a floating definition with no apparent purpose. . . [Under the new Act, w]hat is now considered 'disposable' is based upon historical data – current monthly income derived from the six-month period preceding the bankruptcy filing. 11 U.S.C. §. 101(10A), 1325(b)(2). The court finds that, in order to arrive at 'projected disposable income,' one simply takes the calculation mandated by § 1325(b)(2) and does the math.

<u>In re Alexander</u>, 344 B.R. at 749.

This position is supported by the fact that the only phrase that is defined, within quotation marks, in the pertinent section of the statute is "disposable income." § 1325(b)(2) The setting apart of that phrase lends support to a reading that the word "projected" modifies the phrase "disposable income," rather than becoming another – undefined and free-standing – phrase within the statute. If Congress meant "projected disposable income" to mean something different from "disposable income" projected into in the future, it could have so indicated by including those three words in quotation marks, signaling a separate phrase with a separate meaning. Moreover, reading projected to modify "disposable income" is consistent with the interpretation of "projected" in the pre-BAPCPA statute where a debtor's disposable income – calculated, admittedly, according to a different formula – was projected through the term of the plan. As the <u>Brady</u> court observed:

> The simple and direct meaning of the phrase, in the context of the provision that the plan must apply 'all of debtor's projected disposable income to be received in the applicable commitment period. . . to make payments to unsecured creditors under the

9

> plan,' is that the debtor's disposable income, as calculated under the statute, which is projected to be received over the course of the applicable commitment period, must be dedicated to payment of the unsecured creditors. In this regard, the phrase 'projected disposable income' did not change as a result of the BAPCPA amendments. . . . [T]he term 'projected' requires the court to 'project' forward the debtors' disposable income, as now defined under the revised Code, to determine the requisite payments to unsecured creditors under the plan.

Brady, 361 B.R. at 772

Courts that do not subscribe to that reading have focused on the word "projected" in order to differentiate "disposable income" in § 1325(b)(2) from "projected disposable income" in § 1325(b)(1)(B) – which allows them to, in various ways, import Schedules I and/or J into their analysis. For example, in Kibbe, the court opined:

> Had Congress intended 'projected disposable income' to be synonymous with section 1325(b)(2)'s 'disposable income,' it could have deleted the word 'projected' from section 1325(b)(1)(B) or defined 'projected gross income,' rather than only 'disposable income' in section 1325(b)(2). As Congress did neither, the Court must give effect to the word 'projected.'

In re Kibbe, 342 B.R. at 414. Similarly, in In re Jass, the court stated that it must

> give meaning to the word 'projected,' as it obviously has independent significance," given that it is future-oriented, while "'disposable income' is oriented in historical numbers. . . . The significance of the word 'projected' is that it requires the Court to consider both future and historical finances of a debtor in determining compliance with § 1325(b)(1)(B)."

340 B.R. at 415-16. The Jass court concluded that the means test was only the starting point for the inquiry into projected disposable income "unless the debtor can show that there has been a substantial change in circumstances such that the numbers contained in Form B22C are not commensurate with a fair projection of the debtor's budget in the future." Id. at 418. If the debtor provided adequate evidence to rebut the presumption in favor of the means test form, the court "would allow the debtor to use a projected budget in the form of Schedules I and J to determine the debtor's 'projected disposable income.'" Id. Other courts add to this past-future distinction by noting that because § 1325(b)(1)(B) refers to projected disposable income "to be received" in the applicable commitment period,

> [i]f Congress had intended that projected disposable income for plan purposes be based solely on pre-petition average income, this language would be superfluous. This suggests that Congress intended to refer to the income actually to be received by the debtor during the commitment period, rather than pre-petition average income.

Hardacre, 338 B.R. at 723. Reading this phrase as the Kibbe, Jass, and Hardacre courts have done seems to strain and distort the meaning of "projected" beyond the common understanding of that word, and this Court must therefore reject that approach.

The Trustee, in his Reply Brief, contends that allowing the Debtors "to continue to make substantial

10

payments on a major piece of heavy equipment which [they] no longer use[ ] to earn income, and [in an amount] in excess of the debtors' entire Chapter 13 Plan payment" is absurd (doc. # 24). This Court disagrees and finds that "[t]he plain meaning that [the statute] sets forth does not lead to absurd results requiring us to treat the text as if it were ambiguous." Lamie, 540 U.S. at 536. The Debtors have properly filled out the means test form, have complied with the instructions set forth in § 707(b)(2), and have arrived at a sum that they might reasonably expect to have available for the Chapter 13 Plan over the next 60 months. One may question the logic of relying upon historical data, and debate whether it yields a reliable prediction of the Debtors' ability to make plan payments, or constitutes the best formula for computing those payments. But such differences of opinion are based on the policy implications of the amended statute and do not make the statute ambiguous or the result absurd. There is no inherent flaw in calculating disposable income based upon an historical figure, or in using the result of that computation in a forward-looking projection of income through the commitment period. The entire text of §1325(b)(1)(B) is future-oriented, with use of the words "projected," "to be received," and "will be applied" referring to disposable income – a defined term – that will be rendered by the debtor in the future, i.e., during the course of the commitment period. These terms are not superfluous and they are consistent with each other.  In BAPCPA, Congress declared that the historical income data from the six months prior to the filing of the bankruptcy petition is a more reliable indicator of a debtor's future financial situation than the income on the day the debtor filed for bankruptcy relief, and has directed courts to adjust their starting point for analyzing Chapter 13 plans accordingly. While this may constitute a dramatic change from pre-BAPCPA policy – and a point upon which reasonable minds may differ—it is well within the prerogative of our Legislative branch to make such changes. It is the role of the Judicial branch to carry them out. As our sister court has astutely observed,

> [T]he court's job is to interpret the new statute as clearly written, not to nostalgically preserve the past by seizing on isolated words such as "good faith" and "projected" and inflating their meaning beyond justification.

Alexander, 344 B.R. at 752.[5]

---

[5] In examining the Congressional intent reflected in the current definition of "disposable income," and how it can lead to results that are not aligned with pre-BAPCPA law, authors Marianne B. Culhane & Michaela M. White describe some of the behind-the-scenes lobbying by chapter 13 trustees who identified the likely change in direction the proposed changes would cause:
> Chapter 13 trustees recognized early on that this redefinition of disposable income meant some high-income debtors would pay less than they would have under the variant judicial tests and local legal culture that previously measured the chapter 13 disposable income. The chapter 13 trustees repeatedly made their concerns known to Congress, asking that CMI less deductions be a minimum, not the maximum, but no changes were made.

"Catching Can-Pay Debtors: Is the Means Test the Only Way?" 13 Am. Bankr. Inst. L. Rev. 665 at 681 (2005). It is now evident that Congress rejected the Trustees' recommendations. The Alexander court, citing this article, observed, "As in Lamie, 'this alert, followed by the Legislature's non-response, should support a presumption of legislature awareness and intention.'" 344 B.R. at 748 (quoting Lamie, 540 U.S. at 541). In any event, Alexander concluded, "even if this law is producing unintended results, it is the job of Congress to amend the statute," and "[i]t is beyond our province to rescue Congress from its drafting errors, and to provide for what we might think . . . is the preferred result." Id. (quotation omitted).

Unfortunately, Congress' retention of the familiar words "disposable income" and "projected disposable income" in § 1325(b)(1)(B) and (b)(2) makes it harder for courts to abandon the tried and true confirmation analysis that had its starting point in the debtor's income and expenses as of the filing date. Moreover, the consequences of the changes to § 1325 may well mean that some cases that would have been confirmed pre-BAPCPA no longer qualify for confirmation, and some cases that would not have qualified for confirmation pre-BAPCPA now meet the confirmation standards.[6] However, the stark reality is that there is now a litmus test for confirming an above-median debtor's Chapter 13 plan: it is whether the plan meets the mechanical formula Congress has articulated in the statute, and the courts must apply it.

This Court concludes that the language in amended § 1325(b) is unambiguous with regard to how "disposable income" and projected disposable income are to be calculated under BAPCPA. Accordingly, the Court must calculate, and assess the sufficiency of, the plan payment for the above-median Debtors in this case by application of the formulas set forth in subsections 1325(b)(2) and (3), and rely upon the figures computed in the means test without regard to the content of Schedules I and J. Therefore, that part of the Trustee's objection which seeks to have this Court assess the adequacy of the Debtors' plan payment by reference to Schedule I and J is overruled; and the Court specifically finds that the Debtors have met the requirement that they apply all of their projected disposable income to the plan.

**II.    Is the Reasonableness of the Debtors' Backhoe Payment Subject to Court Scrutiny?**

Having concluded that an above-median debtor's income, expenses, and disposable income are determined by the means test, and that projected disposable income is derived solely from these figures, the Court turns to the Trustee's objection that since the Debtors' backhoe expense is neither necessary nor reasonable, the Court has discretion to deny confirmation of the plan. Under pre-BAPCPA practice, the Trustee would have had a strong argument. During that era, a debtor's disposable income "was generally calculated by subtracting the debtor's expenses on Schedule J from the debtor's income on Schedule I. The bankruptcy court decided in its discretion whether the expenses on Schedule J were in fact 'reasonably necessary.'" In re Farrar-Johnson, 353 B.R. at 228 (quoting In re Alexander, 344 B.R. at 746).

As discussed above, BAPCPA has removed the bankruptcy courts' discretion to consider the reasonableness of the expenses set forth in Schedule J in above-median cases. The question presented here is

---

[6] For example, in In re Jass, where the debtors had recently experienced a change in circumstances that made it almost certain their future income would be less than the income they had received during the six months before filing, the court found applying the statute in a manner that required the debtors to pay the disposable income amount indicated on the means test form, any plan they proposed would fail the feasibility test. 340 B.R. at 417. In In re Hardacre, 338 B.R. 718, 722 (Bankr. N.D.Tex. 2006), the court observed that under BAPCPA, a debtor who anticipates a significant enhancement of future income would be motivated to file as soon as possible because the amount of money she would be required to commit to a plan would be based on the lower average income in the six months prior to filing – noting that this result is not in keeping with the effort to curb bankruptcy abuses. Other bankruptcy courts have pondered why Congress chose the approach it did as furthering BAPCPA's stated purpose of preventing bankruptcy abuse, given that in some cases it has opened a loophole for above-median debtors. See, e.g., Brady, 361 B.R. at 773-74; Rotunda, 349 B.R. at 332-33; Guzman, 345 B.R. at 642, 646; Alexander, 344 B.R. at 748, 750; Barr, 341 B.R. at 185.

12

whether the Court may condition confirmation of the plan on the elimination of the Debtors' $195 backhoe expense if it finds that expense is neither reasonable nor necessary. The Debtors included the backhoe debt in "Part IV, Subpart C: Deductions for Debt Payment" of the means test form, line 47(b). The provision in § 707(b)(2) corresponding to the deduction for secured debt states that the total deductible secured debt is comprised of:

> (I) the total of all amounts scheduled as contractually due to secured creditors in each month of the 60 months following the date of the petition; and
>
> (II) any additional payments to secured creditors necessary for the debtor, in filing a plan under chapter 13 of this title, to maintain possession of the debtor's primary residence, motor vehicle, or other property necessary for the support of the debtor and the debtor's dependents, that serves as collateral for secured debts;
>
> divided by 60.

§ 707(b)(2)(A)(iii)(I) and (II). An eminent authority on the means test, Bankruptcy Judge Eugene R. Wedoff, has explained the significance of the applicable subclause as follows:

> These provisions divide a debtor's total secured debt into two categories: the debt currently due and the debt that is in arrears. As to the <u>current secured debt</u>, subclause (I) directs a deduction for all of the debt that will become contractually due in the five years after the filing of the bankruptcy case, <u>without regard to whether the property securing the debt is necessary</u>. Thus, for purposes of the means test, debt secured even by such items as luxury vehicles, pleasure boats, and vacation homes would be deductible.

Wedoff, <u>Means Testing in the New § 707(b)</u>, 79 Am. Bankr. L.J. at 274 (emphasis added). The Court adopts this interpretation, and when confronted with a question concerning whether the deduction for a particular secured debt of an above-median debtor is reasonable and necessary, will refrain from interposing its judgment if the debtor is current on the payment obligation in question. Since the Debtors are current on their secured debt for the backhoe, § 707(b)(2)(A)(iii)(I) leaves the Court no discretion with respect to whether the backhoe expense is necessary.[7]

---

[7] A Court may have discretion to determine whether other types of deductions listed on the means test form are reasonable and necessary. Part IV, Subpart A of the means test allows deductions under IRS National and Local Standards. The debtor is instructed to enter information from various charts containing figures conforming to applicable family size and income level for national standards, and family size and county for local standards. Subpart A also contains some lines where the debtors input "Other Necessary Expenses" which are based on "actual" expenses. Subpart B, "Additional Expense Deductions Under § 707(b)," permits the debtor to take deductions for other "actual" expenses, and permits an "additional food and clothing expense" supported by "documentation demonstrating that the additional amount claimed is reasonable and necessary." means test, Line 44. Interestingly, the statute, in setting out allowable expenses under § 707(b)(2)(A)(ii)(I), provides that "Other Necessary Expenses" "shall include reasonably necessary health insurance, disability, insurance, and health savings account expenses." Other provisions echo the "reasonably necessary" language. See § 707(b)(2)(A)(ii)(II), (IV), (V). There has been some litigation on the discretion inherent in this statutory language. See, e.g., In re Devilliers, 358 B.R. 849, 865 (Bankr. E.D.La. 2007). Since these expenses are not implicated here, it is beyond the scope of this decision to address that issue. See also Wedoff, 79 Am. Bankr. L.J. at 275.

Accordingly, the Trustee's objection asserting that confirmation should be denied because the backhoe payment is unreasonable, and that the Debtors' retention of the backhoe is unnecessary, must fail.

### III. What Is the Role of the Payment Amount in the Good Faith Analysis?

The Trustee also objects that the Debtors have not proposed their Plan in good faith because they continue to devote funds to the backhoe payment that should be devoted to the Plan. He argues that "[t]he strict mechanical application of the means test does not necessarily satisfy the debtor's burden of demonstrating good faith in the proposal of their plan, including whether they are devoting sufficient income to their plan," (doc. # 22, quoting In re Edmunds, 350 B.R. 636, 648-49 (Bankr. D.S.C. 2006)), and urges the Court to "continue to use the information set forth in the [Debtors'] Schedules I and J to determine what good faith requires the debtor [to] commit to the Plan" (doc. # 22).

The Debtors counter that, based on the means test, they are not obligated to pay any dividend to unsecured creditors, and hence their Plan to pay a 4% dividend to unsecured creditors actually constitutes an affirmative showing above what is necessary to establish good faith (doc. # 23 at 14-15).

In scrutinizing the nexus between the amount of the plan payment and the good faith requirement of § 1325(a)(3), the Court finds the analysis articulated in Farrar-Johnson to be persuasive. In that case, the trustee had argued that the debtors' inflated expenses on Schedule J and their improper housing allowance deduction established a lack of good faith in the proposal of their plan. The Farrar-Johnson court rejected these arguments, positing that those kinds of "good faith objections to a debtor's disposable income ha[ve] had little or no potency" since the 1984 amendments to the Code which added § 1325(b) and the disposable income test. The court held that these amendments eliminated the good faith inquiry based on whether the plan proposed "'substantial or meaningful repayment to unsecured creditors.'" Farrar-Johnson, 353 B.R. at 231-32 (quoting In re Smith, 848 F.2d 813, 820 (7th Cir. 1988)). The court explained

> After 1984, a debtor's expenses were either "reasonably necessary" or they were not. If they were, and the plan was otherwise confirmable, it would "be confirmed even if it provide[d] for minimal (or no) payments" to unsecured creditors. . . . If that was true after 1984, it is a fortiori true after 2005, at least in the case of debtors with income above the median. For those debtors . . . the determination of disposable income is now meant to be a simple and straightforward matter of arithmetic based on sections 707(b)(2)(A) and (B). Debtors may claim applicable expenses under the IRS National and Local Standards, and may also claim actual Other Necessary Expenses, without any judicial consideration of whether those expenses are in fact 'reasonably necessary'.

Id. at 232 (quoting Smith, 848 F.2d at 820 and citing 3 Keith M. Lundin, Chapter 13 Bankruptcy § 193.1 at 193-1 (3d ed. 2006)). The court ultimately concluded:

14

> [i]f the reasonable necessity of a debtor's expenses is no longer relevant, then plainly the debtor's "good faith" in claiming them cannot be relevant. Disposable income is "determined under section 1325(b) rather than as an element of good faith under section 1325(a)(3)."

Id. quoting Barr, 341 B.R. at 186 and citing Alexander, 344 B.R. at 752.

Similarly, in its discussion of the connection between good faith and the amount of a chapter 13 Plan payment, Collier on Bankruptcy observes that the BAPCPA amendments to § 1325(b) emphasize that § 1325(b), not § 1325(a)(3), controls:

> Instead of simply looking at the debtor's actual income and expenses, these [2005] amendments in many cases attempt to create a bright line test to determine whether a debtor's plan is committing all disposable income. By creating a bright line test, Congress even more clearly indicated that it intended section 1325(b), rather than the good faith test, to be the measure of whether the debtor was committing sufficient income to the plan.

8 Collier on Bankruptcy ¶ 1325.08[1] (15th ed. rev. 2005). Accord Marianne B. Culhane & Michaela M. White, Catching Can-Pay Debtors: Is the Means Test the Only Way?, 13 Am. Bankr. Inst. L. Rev. 665, 681 (2005).

Persuaded by these interpretations of the good faith requirement for confirmation under the current statute, this Court concludes that post-BAPCPA, "[t]he disposable income a debtor decides to commit to his plan is not the measure of his good faith in proposing the plan," Farrar-Johnson, 353 B.R. at 232. Since neither the record nor the Trustee's objection identify any factor other than the amount of the plan payment to support a finding that the Debtors' Plan fails to meet the good faith requirement, and there is no dispute that the Debtors properly computed the plan payment under the means test, the Court finds the Debtors' Plan may not be denied confirmation based upon the good faith plan requirement of § 1325(a)(3).

## CONCLUSION

For the reasons set forth above, the Court overrules the Trustee's objection to confirmation. It holds that the plain language of the BAPCPA amendments to § 1325 require these above-median Chapter 13 debtors to calculate their plan payment pursuant to the means test without regard to the monthly net income indicated on their Schedule J; that the reasonableness or necessity of the expenses listed on Schedule J play no role in the confirmation process of the Debtors' Plan since they have above-median income; that the statute does not permit the Court to exercise discretion with respect to the reasonableness of the backhoe expense listed as a secured debt on the means test because the Debtors were current on this obligation on the date they filed their bankruptcy petition; and that this Court may not deny confirmation of the Plan proposed by these above-median Debtors based upon the amount of the plan payment since the payment they propose to pay unsecured creditors satisfies the mandates of the means test and § 707(b)(2). Accordingly, the Court confirms

15

the Debtors' Plan dated January 24, 2007.

    This constitutes the Court's findings of fact and conclusions of law.

August 7, 2007                                                         Colleen A. Brown  
Rutland, Vermont                                     United States Bankruptcy Judge